**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEATRIZ ALBINO, individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>- against -<br><br>BEIERSDORF INC.,<br>Defendant. | 1:25-cv-08230-BCM<br><br>First Amended Complaint<br><br>Jury Trial Demanded |

Beatriz Albino ("Plaintiff"), through Counsel, alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. With increasing access to information from non-traditional sources, and citizen journalists, there is greater awareness of the potential harms lurking in everyday products.

2. Even traditional media could no longer turn a blind eye, evinced by the New York Times' acknowledgement that "Many Personal Care Products Contain Harmful Chemicals."[1]

3. Anxious to take "small steps to lower [their] exposure," the once uninquisitive public appears to have taken notice.

[1] Knvul Sheikh, Many Personal Care Products Contain Harmful Chemicals, New York Times, Feb. 15, 2023

4. However, because most people (1) lack detailed knowledge about what ingredients could potentially be harmful, and/or (2) are unfamiliar with technical and scientific nomenclature, public health advocates encourage reliance on heuristics, or "shortcuts," when deciding what to buy.

5. This includes choosing personal care products which highlight the absence of various classes of ingredients.

6. A key ingredient type consumers are looking to avoid are "preservatives," defined by dictionaries and/or regulatory authorities, and/or understood by the public, to refer to chemical or synthetic compounds, which tend to, and prevent deterioration.[2]

7. The market for personal care products without preservatives has responded accordingly, reported to be worth billions of dollars per year.

8. That avoidance of preservatives in personal care products is prudent was confirmed by the Silent Spring Institute, which noted that "Consumers who avoid products with harmful chemicals [like preservatives] on the label have lower body burden," such as fewer negative reactions, less irritation, etc.

9. University of California Berkeley researchers identified how even small

[2] See Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or has the power of preserving."); Oxford English Dictionary (defining "preservative" as "[t]ending to preserve or capable of preserving"); see also, 21 C.F.R. § 101.22 (defining chemical preservative, but in context of foods).

amounts of preservatives in personal care products may be linked to certain cancers.

10. To appeal to purchasers of personal care products who value those without preservative, and/or chemical preservative ingredients, Beiersdorf Inc. ("Defendant") sells lip repair ointment, promoted as having "No preservatives or dyes," under its Aquaphor brand ("Product").[3]




11. The Product is "misbranded,"[4] because despite representing it has "No

---

[3] Other statements include "Immediate Relief," "Fragrance free and Paraben free," "Appropriate for sensitive lips," and "For severely dry lips."

[4] Defining "misbranded" as labeling that is false and/or misleading, and "adulterated" to mean rendering something poorer in quality, by adding another substance, typically an inferior one.

preservatives," it includes[5] "Tocopheryl Acetate…Sodium Ascorbyl Phosphate…[and] Magnesium Stearate," non-natural, synthetic, and/or chemical ingredients, which tend to, do, and/or can, function, to prevent the Product's deterioration.




12. Neither tocopheryl acetate, sodium ascorbyl phosphate, nor magnesium stearate, are natural ingredients.

13. Though tocopherols are the natural form of vitamin E, found in nuts, seeds, and certain vegetable oils, tocopheryl acetate is not found in nature.

14. Instead, it is synthesized by first creating alpha-tocopherol through the acid-catalyzed condensation of trimethylhydroquinone and isophytol.

15. This is followed by esterification with acetic anhydride or acetic acid using advanced, often chemical, catalysts.

---

[5] **Ingredients:** Octyldodecanol, C18-38 Alkyl Hydroxystearoyl Stearate, Ricinus Communis (Castor) Seed Oil, Caprylic/Capric Triglyceride, Glycerin, Panthenol, Bis-Diglyceryl Polyacyladipate-2, Water, Polyglyceryl-3, Diisostearate, Butyrospermum Parkii (Shea Butter), Hydrogenated Castor Oil, Tocopherol, Tocopheryl Acetate, Sodium Ascorbyl Phosphate, Bisaboloi, Beeswax, C20-40 Alkyl Stearate, Magnesium Stearate, Magnesium Sulfate.



16. Though sodium ascorbyl phosphate is a form of vitamin C, this chemical ingredient is not obtained from citrus fruits, like oranges.

17. Instead, it is made by reacting ascorbic acid with calcium chloride and sodium hydroxide to form calcium ascorbate.

18. Then, a phosphorylating agent, such as sodium trimetaphosphate or phosphoryl chloride, is added to the calcium ascorbate solution, often in industrial tanks.



19. This reaction attaches a phosphate group to the ascorbic acid molecule, creating ascorbyl phosphate.

20. Next, the solution's pH is adjusted with sulfuric acid, isolating the ascorbate phosphate.

21. Then, it is treated with sodium hydroxide to convert the calcium ascorbate into sodium ascorbyl phosphate.

22. Lastly, it is subject to numerous filtration steps to remove impurities.

23. Though stearic acid exists in animal and vegetable fats, used widely in personal care products, magnesium stearate is found only in chemical laboratories.

24. The magnesium stearate used in the Product begins by reacting a magnesium compound with stearic acid or sodium stearate.




25. In one variation, the stearic acid is reacted with sodium hydroxide to form sodium stearate.

26. This is followed by adding magnesium sulfate or magnesium chloride, causing magnesium stearate to precipitate out as a solid.

27. An alternative method entails directly reacting magnesium oxide or magnesium hydroxide with stearic acid, at elevated temperatures.

28. Though personal care products are relatively stable, they contain water and organic/inorganic compounds.

29. This requires preservation against microbial contamination to guarantee consumer's safety and to increase their shelf-life.

30. These types of products are subject to deterioration, spoilage, rancidity, and/or microbiological risks, which not only cause them to degrade, but can cause harm to the user, such as infection or contamination.

31. These can be exacerbated by environmental conditions, like high temperatures, and humidity.

32. Risks may also present upon exposure to oxygen, as the tube will be opened and closed repeatedly throughout its use.

i. Tocopheryl Acetate

33. Though tocopheryl acetate provides benefits to skin as part of the Product, it is useful in helping to maintain its stability and/or efficacy.

34. Though not a direct antimicrobial preservative, tocopheryl acetate functions in the Product as a potent antioxidant.

35. This is based on its ability to limit oxidation, by scavenging free oxygen molecules.

36. The Product's oil-based components, like octyldodecanol, its most predominant ingredient, make it susceptible to oxidation, where the chemicals break down.

37. This is due to exposure to light, heat, moisture, opening and closing the tube, etc.

38. Oxidative breakdown, through the formation of peroxides, causes

malodor, rancidity, negative changes in texture, and/or reduces the potency of the Product's ingredients.

39. Moreover, development of peroxides can be harmful and/or irritating to skin.

40. By adding tocopheryl acetate, the Product's stability, efficacy, and/or quality, from the time it is manufactured, throughout the time it is used by the consumer, is maintained and/or increased.

ii. <u>Sodium Ascorbyl Phosphate</u>

41. Beyond supplying vitamin C and protecting the user's skin, sodium ascorbyl phosphate's usage, typically less than one percent, contributes to the Product's stability over extended periods.[6]

42. Ascorbic Acid and its salts, such as sodium ascorbyl phosphate, are used in the formulation of this type of personal care products as antioxidants to slow deterioration caused by exposure to the air

43. Sodium ascorbyl phosphate's use in the Product helps in adjusting its final pH to between 6 and 7, contributing to its stability.

44. Sodium ascorbyl phosphate also has antimicrobial properties that inhibit

[6] Elmore AR. Final report of the safety assessment of L-Ascorbic Acid, Calcium Ascorbate, Magnesium Ascorbate, Magnesium Ascorbyl Phosphate, Sodium Ascorbate, and Sodium Ascorbyl Phosphate as used in cosmetics. INT J TOXICOL. 2005;24 Suppl 2:51-111. doi: 10.1080/10915810590953851. PMID: 16154915.

the growth of bacterial strains.[7]

45. Sodium ascorbyl phosphate has similar antioxidant properties to ascorbic acid, helping to limit oxidation, by scavenging free oxygen.

46. Sodium ascorbyl phosphate's antimicrobial properties means it can be useful in inhibiting growth of harmful bacteria, and microorganisms of concern.

iii. Magnesium Stearate

47. The Product's use of magnesium stearate helps to maintain its stability, by contributing to the separation of its ingredients over time.

48. This function is especially important in this type of product, which contains oil-based ingredients.

49. The result is that its shelf life is extended beyond what it would be without its addition.

50. The addition of tocopheryl acetate, sodium ascorbyl phosphate, and/or magnesium stearate (i) prevent degradation of the Product, upon exposure to air, change in conditions, exposure to light, dark, and/or moisture, (ii) prevent oxidation, (iii) provide antimicrobial benefits, (iv) contribute to emulsion stability, since an ointment is a type of emulsion, (v) contribute to a pH environment less conducive to

---

[7] 3Klock J et al. Sodium ascorbyl phosphate shows in vitro and in vivo efficacy in the prevention and treatment of acne vulgaris. INT J COSMET SCI. 2005 Jun;27(3):171-6. doi: 10.1111/j.1467-2494.2005.00263.x.PMID: 18492184.

growth of microorganisms and bacteria, and/or (vi) maintain the potency, and/or efficacy of the ointment, for a longer period.

51. This is because tocopheryl acetate, sodium ascorbyl phosphate, and magnesium stearate, are chemicals that, when added to the Product, tend to prevent or retard deterioration.

52. As a result of the false and misleading representations and omissions, the Product is sold at a premium price, approximately $5.99.

53. This price is higher than the Product would be sold for, if it were represented in a non-misleading way.

54. This will, and/or can be, determined through methods including conjoint analysis, choice analysis, choice-based ranking, hedonic pricing, and/or other similar methods, which evaluate a product's attributes, and/or features.

55. By determining the willingness to pay of consumers for products, including the Product at issue, with and/or without the challenged claims, the value of the challenged claims can be reduced to a monetary value.

**JURISDICTION**

56. Plaintiff Albino is a citizen of New York.

57. Plaintiff Albino is a resident of Bronx County, New York.

58. The Court has jurisdiction over Defendant, because it transacts business within New York, and sells the Product to consumers within New York, through

stores, in this State, to citizens of this State.

## PARTIES

59. Plaintiff Albino is a consumer, not a merchant or re-seller.

60. Plaintiff Albino is a citizen of New York.

61. Plaintiff Albino is a resident of Bronx County, New York.

62. Defendant Beiersdorf Inc. is a Delaware corporation, with a principal place of business in Connecticut.

63. Plaintiff is like many consumers, and looks to labeling and/or packaging of personal care products, to see what she is buying, and/or to learn basic information about them.

64. Plaintiff is like many consumers, and is accustomed to labeling and packaging telling her about a personal care product's significant characteristics, attributes, quantity, qualities, ingredients, and/or features.

65. Plaintiff is like many consumers, who try, where possible, to avoid personal care products with ingredients, including chemical ingredients, which serve, or could serve, preservative functions, believing them to be potentially harmful, not or less natural, less healthy, environmentally harmful, and/or indicative of lesser quality.

66. Plaintiff read, was exposed to, relied on, and/or was caused to pay more money as a result of, "No preservatives or dyes," "Immediate Relief," "Fragrance

free and Paraben free," "Appropriate for sensitive lips," and/or "For severely dry lips," to believe the Product did not contain ingredients, including chemical ingredients, which served, or could serve, preservative functions.

67. Plaintiff was caused to pay more money as a result of, "No preservatives," to believe the Product did not contain ingredients, including chemical ingredients, which served, or could serve, preservative functions.

68. Plaintiff bought the Product, with the labeling and packaging identified here, at or around the above-referenced price.

69. Plaintiff purchased the Product, between August 2022 and June 2025, at stores, in New York.

70. Plaintiff paid more for the Product than she would have, had she known it contained ingredients, including chemical ingredients, which served, or could serve, preservative functions, as she would have paid less.

71. The Product was not "worthless" to Plaintiff, but worth less, than what Plaintiff paid, and she would not have paid as much, absent Defendant's false and misleading statements, and/or omissions.

72. Plaintiff obtained value from the Product, because it provided skin benefits, but seeks the cost difference between the Product, as presented, and as delivered.

73. The Product's features and/or attributes, when taken together, and/or

utilized for the purpose of conjoint analysis, choice analysis, choice-based ranking, hedonic pricing, or other similar methods, impacted Plaintiff's purchasing choice, compared to similar products lacking its features and/or attributes.

## CLASS ALLEGATIONS

74. Plaintiff is a consumer, not a re-seller or merchant.

75. Plaintiff seeks to represent other consumers, in the class identified below, against a big business:

> Only citizens of New York, who purchased the Product, for personal use, in New York, during the statutes of limitations.

76. Plaintiff's claims are based upon New York's General Business Law ("GBL") §§ 349 and 350, passed by the legislature, to protect the New York public, and unsophisticated New York consumers, against large and sophisticated businesses.

77. Excluded from the Class are (i) Defendant, Defendant's board members, executive-level officers, members, attorneys, and immediate family, (ii) governmental entities, (iii) the Court, the Court's immediate family, and Court staff, (iv) any person that timely and properly excludes himself or herself from the Class, (v) non-citizens of New York, (vi) persons who bought the Product outside New York, (vii) persons who used or consumed the Product outside New York, (viii) persons who may be citizens of more than one State, and (ix) any persons who would

otherwise be eligible to be a part of the Class, but seek to pursue statutory penalties, as opposed to actual damages.

78. Common questions of issues, law, and fact predominate, and include whether Defendant's representations were, and are misleading, and if Plaintiff and class members are entitled to damages.

79. Plaintiff's claims and basis for relief are typical to other members, because all were subjected to the same unfair, misleading, and/or deceptive representations, omissions, and/or actions.

80. Plaintiff is an adequate representative, because her interests do not conflict with other members.

81. No individual inquiry is necessary, since the focus is only on Defendant's practices, and the class is definable and ascertainable.

82. Individual actions would risk inconsistent results, be repetitive, and/or are impractical to justify, as the claims are modest, relative to the scope of the harm.

83. The class is sufficiently numerous, because the Product has been sold throughout the State for several years, with the representations, omissions, packaging, and/or labeling identified here, from stores in this State, to citizens of this State.

84. Plaintiff's Counsel is competent and experienced in consumer class actions, and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

## COUNT I

New York General Business Law ("GBL") §§ 349 and 350

85. To the extent required, this section incorporates by reference other paragraphs, as necessary.

86. The purpose of the GBL is to protect New York consumers against unfair and deceptive practices.

87. The GBL considers false advertising, unfair acts, and deceptive practices, in the sale of consumer goods, to be unlawful.

88. Violations of the GBL can be based on (1) other laws and standards related to consumer deception, (2) public policy, established through statutes, laws, or regulations, (3) principles of other jurisdictions, (4) decisions with respect to those principles, (5) any rules promulgated pursuant to acts designed to prevent deception, and/or (6) standards of unfairness and deception set forth and interpreted by other agencies, entities, tribunals, and bodies.

89. Defendant's false and deceptive representations and omissions, with respect to the Product's contents, origins, ingredients, type, functionality, amount, quantity, and/or quality, were material in that they were likely to influence consumer purchasing decisions.

90. The packaging and labeling of the Product violated the GBL, because the representations, omissions, design, markings, and/or other elements, including,

"No preservatives or dyes," "Immediate Relief," "Fragrance free and Paraben free," "Appropriate for sensitive lips," and/or "For severely dry lips," and specifically, "No preservatives," caused purchasers to expect it did not contain ingredients, including chemical ingredients, which performed, or could perform, preservative functions, which was unfair and deceptive to consumers.

91. The packaging and labeling of the Product violated laws, statutes, rules, regulations, and/or norms, which prohibit unfair, deceptive, and/or unconscionable conduct, against the public.

92. The packaging and labeling of the Product violated the GBL, because the representations, omissions, design, markings, and/or other elements, including, "No preservatives or dyes," "Immediate Relief," "Fragrance free and Paraben free," "Appropriate for sensitive lips," and/or "For severely dry lips," and specifically, "No preservatives," caused purchasers to expect it did not contain ingredients, including chemical ingredients, which served, or could serve, preservative functions, contrary to statutes and/or regulations, which prohibit consumer deception by companies in the labeling of personal care products.

93. Plaintiff paid more for the Product, and/or would not have paid as much, if she knew that it contained ingredients, including non-natural, and/or synthetic ingredients, which served, or could serve, preservative functions.

94. Plaintiff seeks to recover for economic injury and/or loss she sustained,

based on the misleading labeling and/or packaging of the Product, a deceptive practice under the GBL.

95. Plaintiff may produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and/or labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, choice-based ranking, choice-based conjoint analysis, and/or other advanced and complicated methodologies.

96. This means individual damages will be based on the value attributed to the challenged claims, practices, and/or omissions, a percentage of the total price paid, instead of the Product's total price.

97. This is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for, without the misleading labeling, packaging, representations, statements, omissions, and/or marketing, identified here.

98. This difference is typically between five ($0.05) and sixty cents ($0.60) per unit, a small fraction or percentage of the total price.

99. As a result of Defendant's misrepresentations and omissions, Plaintiff was economically injured, and caused to suffer economic or financial damages, by payment of the above-identified price premium for the Product.

100. Plaintiff was caused to pay more than she would have paid for the Product, based on the identified misrepresentations and/or omissions.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff seeks:

1. To declare this a proper class action, certifying Plaintiff as representative, and the undersigned as Counsel for the Class; and
2. All available damages.

December 30, 2025

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel (516) 268-7080
Fax (516) 234-7800
spencer@spencersheehan.com

## Certificate of Service

I certify, that on December 30, 2025, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

| | Electronic Filing | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant | ☒ | ☐ | ☐ | ☐ |
| Plaintiff | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan